I don't know why we have to ask so many questions, I don't know, I'm just kidding. You can't see that. We're in brief recess, we're in brief recess, so relax for a moment. Sorry. Okay. Next argued case is 19-1649, HVLPO2 against Oxygen Frog. Mr. Simple. Thank you. May it please the court. My name is Marty Simple. I'm an attorney in Tallahassee, Florida, on behalf of the appellant, HVLPO2 LLC, and with me is my co-counsel, Allie Aker. Your honors, this case, the issue in this case is what is the minimum required to sustain the burden of proof on an obvious defense in a patent infringement action. As the court is aware, these patents in suit were invalidated based on two prior art references. One known as the low tide video, which was published on YouTube back in 2010, and the other, which is referred to as the Coronet reference, which was published on an internet website called the Melting Pot, also in 2010. There is several critical holes in the proof that require reversal of this judgment of invalidity, and I'm going to walk through each of those. The first is with respect to the low tide video that was published on YouTube. The issue there is whether that constitutes a printed publication within the meaning of 35 U.S.C. section 102, and we would contend that it does not qualify. And specifically, the reason it doesn't qualify is because there was no evidence put on at which is the priority date of these patents, would have been motivated to go to YouTube to find pertinent prior art. The problem I have with that argument is we have printed publications, cases, where we found things like a thesis in a shoebox in the basement of a library in Germany was prior art that could be used under 102. With all due respect, a YouTube video is much more accessible than what I just described. Maybe. I mean, it depends. I think that's the key, is maybe, and I'll direct. But that would be a question of fact. It has to be some facts. There has to be some facts presented. There was no evidence whatsoever presented as to what a person skilled in the art in 2012 would be motivated to look at. Let me address your shoebox comparison. It may be that that shoebox was maintained by somebody who people skilled in the art were familiar with and would know to go... It wasn't. It was a PhD candidate. That was a PhD thesis. So a PhD candidate would, by virtue of their position, not be a known skilled artisan. I don't know the case you're referring to, but the case that I've... It's called In Ray Hall. What's it called? It's called In Ray Hall, if you ever want to look at it. But the case that I'm relying on is called Blue Calypso, and that was a case where, similar to what you're talking about, the person published a hyperlink on their personal web page. I think Judge Chan was involved in this case. Everything is on an easily accessible internet web searchable kind of place. Do you think that the accused infringer who is seeking to enter that in as prior art must also in every case, no matter what the reference is, establishes that the location in which it is, is the kind of location that a skilled artisan would have gone to? Yes. You think they have to do that, even if you've introduced nothing that suggests it's not? I lost the last one. Do you think they have to do that, even if you've introduced nothing by way of evidence that suggests this is not the kind of place someone would go? I think the burden's on the party asserting the invalidity defense for sure, and think about the... So every printed publication that's a magazine, that's a thesis, that's a searchable on the adds to the list of things that somebody entering that reference into evidence must establish. They must put up a skilled artisan to say, I would have gone to that location to look. I think that in this context, when you're talking about what I would refer to as an obscure internet site... YouTube? You think YouTube is obscure? No, no. You may be too old for that. That's what the district judge said, but think about the implications of what you're asking. Instagram, Facebook, YouTube. Where does it stop? Where does it stop with the obligation of someone skilled in the art, and mind you, seven years ago to... You don't have to prove anything. You can't assume that this was something a person skilled in the art would have been motivated to go look at. Again, I say, should they have went to Mr. Peeb's Instagram account? Should they have went to Mr. Peeb's Facebook account? Where does it stop? Why would they go to a thesis in the basement of a German library? We got a lot of printed publication cases. This case, in our view, is on all fours with Blue Calypso. The holding in that case was that there was no proof that a person skilled in the art would have been motivated. If I can recall what happened in Blue Calypso, this just happened to be one graduate student that had her own personal webpage, and she posted some paper that she had drafted on her personal webpage. But there was no evidence that it had been tagged in a way that it could be findable unless you knew this particular web address for this particular grad student, and then looked around on that webpage to see what kind of papers she may have posted. YouTube is something that's widely accessible, and it does feel like something that's just a lot of different things that are in the public domain, and YouTube itself is searchable, and so you can quickly access all the different videos that have been uploaded onto YouTube. That's why it feels a little different to me. Maybe actually a lot different to me than a random webpage of a single person that's occupying some netherworld of cyberspace that you can't really get to unless you actually know that specific web address. I understand your question. I think that Mr. Peebs is no less obscure in this case than that PhD student was in that case. The question is, and it's the same question I posed in the district court, the issue isn't whether you could find it if you went to YouTube. The question is, why would you go to YouTube in the first place? That's the issue, and I will repeat, there's no evidence in this record that anybody would have in 2012, and that's the issue squarely before this court. I understand Judge Moore's concern that we're creating some sort of new evidentiary standard, but the burden is on the plaintiff to prove this, and prove that it's a printed publication, and we're talking about patents that have a presumption of validity, and the standard to invalidate them is by clear and convincing evidence, so it's not a little deal here. These were issued United States patents to my clients, so yes, we think Blue Calypso does control here, and that that is grounds number one for reversing these judgments. Grounds number two is, there's no evidence that either the Low Tide or the Cornette reference disclose a controller device that sends a signal. Now, the case I cite on this is Par Pharmaceuticals, which stands for the proposition that when you have... Is this your argument about that little gray box? Yeah, this is partially about the little gray box, yes. You didn't bring one with you, did you? What's that? Did you bring one with you? No, it's in my brief. There's a picture in my brief. I guess my understanding of Cornette is it shows you the picture, and then it describes the picture, and describes how the Cornette system works, and it talks about how the system shuts off at 100 PSI and turns on at 80 PSI. Yes. So, I mean, you have to do a little bit of one plus one plus one equals three, but the point here, it seems to strongly indicate that there's something automatic about the system turning off and turning on. And when it's talking about the system, it describes the system as having two concentrators, a compressor, and so, therefore, whatever the device is that's turning on and turning things off, it's turning off both concentrators and the compressor. It's turning on both concentrators and the compressor at the same time, and everything that I just described sounds exactly like what the claimed controller is doing. I mean, maybe to an engineer. The person skilled in the art is not an engineer. Got to remember that. It's a handy bead maker. And Mr. Cornette, I asked him that specific question. Could you tell by this narrative that that was a controller device? He said, no. Only way you know is by looking at the picture. And I cited that colloquially in my reply brief. And so, no, we think the record evidence is you have to look at the picture, and the picture tells you nothing. Mr. Gilmore, the only engineer who testified in this case other than Mr. Fleischman, said I wouldn't know what that thing is just by looking at that picture. And so, that's problem number one with the Cornette reference. Problem number two, let's assume, Judge Chan, that somebody might have known that's a controller. The problem is it's not a digital controller. It doesn't send a signal. The claims, and specifically claim one, which I've quoted in the brief, specifically says send a signal. And the record in the case, I'm pointing the wrong way, Mr. Fleischman admitted at trial that the Cornette controller does not send a signal. And that's at page 372 of the appendix. As I understand it, the claim doesn't call for a digital controller. It just says controller. It calls for a controller that sends a signal. And the evidence, the trial evidence is that the type of controller that sends a signal is a digital controller. And that's what I just, what I'm trying to emphasize, that Mr. Fleischman agreed with that at trial. That the Cornette is a mechanical controller, which has to be hardwired to the other components. You're about to run into your rebuttal time. Can I ask you? Oh, I'm sorry. Can you tell me what was the nature of, I am troubled by the idea that, there are only four witnesses in this case, two by deposition, trans video. And the only question the jury answered on this patent was obviousness. And one of the witnesses who was not offered, proffered, or introduced as an expert, none the less testified, I think in four places, that he concluded it would have been obvious to him, this combination. And I know there was a motion in Lemonet asking that those particular questions and answers not be allowed in the district court, nonetheless allowed them. But he suggested he would give a curative instruction. We've asked for the curative instruction. I understand it's coming possibly on Monday. Do you have a recollection of what the nature of the curative instruction was that you could share with me? Basically, what the judge told the jury was, this is a layperson who you're about to hear this video testimony of. Your job is to determine the issue of obviousness. And if that word comes out, you'll have to give it the weight that you think is deemed appropriate. Oh, my goodness. Now, let me say, I may be wrong, but that's my memory. Did he actually suggest that the jury was entitled to give weight to a layperson's statement about obviousness? I'm going from memory, so don't hold me to this. And Mr. Huntsman may correct me, but I think it was along those lines. You'll have to give it the weight. We'll see Monday, right? Right. Because we'll have a copy of it. You'll have that on Monday, yes, yes, yes. OK, I'm in my rebuttal time, so I'll reserve the rest of my time. Thank you. OK, good. Thank you. Mr. Huntsman. May it please the court. My name is Robert Huntsman. I'm the attorney for the appellees and defendants, which I'll call collectively oxygen fraud. I'd like to start with a few minutes I have to talk just a little bit of history that I think might be helpful to the court that may not be fully clear from the briefings, that may be helpful to some of the issues that we've discussed today. In early 2000 or so was the first time that people figured out this idea of taking these medical oxygen concentrators and combining them so that they could produce a big enough stream of oxygen to supply these glass torches. And that was long before the invention here. The invention here came later, or the claimed invention, I should say, came later on a particular variation. These systems are used primarily in two different ways by these glass blowers. One is they'll use an oxygen gathering system just to gather the oxygen and be directly applied to a torch. Another variation, the one that's at issue here, is it's kind of helpful instead of directly supplying a torch is to take the oxygen and put it in a tank for later usage. And so when you start putting it into a tank, then you have the issue of when you're filling a tank, you need to shut off the tank when it gets full for safety and other obvious reasons. And that's the embodiment that's at issue today. By 2010, there was this group of glass artists that were very active on the Internet. It wasn't just YouTube. They had this forum where they discussed these things with each other, and they presented links to the various YouTube videos addressing the subject matter. When counsel says that there was no facts to support the idea that these YouTube videos were accessible in the record, he's mistaken. Counsel's ignoring the fact that we had a four-day trial with live witnesses, including the authors of the YouTube videos. And they were able to not only authenticate the videos, the date and so forth, but they had never met each other personally, and yet in their testimony, they discussed the fact that they had seen the works of each other, that they had seen each other's videos. So we actually had factual testimony to support that these particular videos had been seen. Plus, there's references to... Is it in the record that they'd seen each other's videos? It is. You're probably going to ask me where, and I'm not going to be able to tell you. But somewhere in the trial... In the testimony of Mr. Cornett and in the testimony of Mr. Peebs, they were both asked questions along those lines. Okay, so both of them sort of acknowledged that they'd seen each other's YouTube videos? Right, and those two and basically everybody that testified except for the expert, Mr. Gilmore, were participants in this web forum where there was... The melting pot? The melting pot, right. Okay, so the particular embodiment... Well, the other thing that happened is the patents at issue had numerous claims, but as part of the procedure, the parties came to an agreement. The plaintiff agreed to drop all the claims except for the four that are at issue here, and in exchange, the defendant agreed to quit selling the accused products. And so when it came time for claims construction, we only had the four claims that are at issue here. And we did have a claims construction, a Markman hearing, and we had the opportunity to brief. So your client, just so I understand, is no longer selling the accused product? That's correct. Why are we here? Why couldn't you guys figure out some way to settle this? I mean, given that you're not selling anymore, and with all due respect, there just can't be that much money at stake in this. You would have to ask the other party. I think it's largely over damages for past sales and that sort of thing. The particular embodiment that was left that's covered is a very narrow one. It's to solve a problem that some of these glassblowers are in residential neighborhoods, and when you start hooking up these little medical concentrators and you start plugging them in, if you plug in too many of them into one circuit, it'll blow the fuse. And so the problem that these claims address is the issue of when that happens, what do you do? Well, the Peebs reference, and Mr. Peebs in live testimony, discussed the fact that you just have to find another outlet to plug in some of the components. Okay, and so that's the solution there. That then raised the problem if you're in the tank thing where you're trying to shut off the tank, that means you have more to shut off because now you've got components plugged into two different wall circuits. And so there's this little wiring issue is when the tank says, shut off, I've got enough oxygen. You have to shut off everything in two circuits. And the solution to that is what's very common in the art is a two-pole switch in these pressure switches. You can buy them at Lowe's, at the big box stores. Come in two-pole versions, and what the two-pole means is when the switch fires, you can switch two different circuits. Gray box, right, little gray box. Well, that's the gray box. And you'll know it in the patent itself, it says that a controller, it lists the things that a controller can be in and it specifically names the mechanical switches, the digital switches, and so forth. So when it came time to construe the claims, the judge, all the claims that had any detail about what a controller did, except for possibly the signaling, were gone. And so we were just left with the controller that signals. And so the issue was, what does the controller have to do to be a controller? And we argued unsuccessfully that it had to do more because all the patents talked about is all this tricky stuff where you turned on certain components before other components. Because the claim would mention it and the accused product, I'll just turn everything on at once or off at once. But the judge concluded that that would be reading the specification into the claims and concluded that the claims of these particular four claims, that the only actions required was that the switch turn everything on and everything off at the same time. And since the accused product did it, we lost on infringement on summary judgment motion. And I might add, the plaintiff was very happy with that ruling that day. Now today, he's come in and say, no, the controller has to do something more than just turn everything on and off. He's saying that the signaling, he's basically, even though claim construction is not an issue here, he's arguing that the claims would be construed so that signaling has a particular meaning that only a digital controller could perform. And I would argue that, A, since neither, even though this court can do claims construction de novo, neither party is suggesting that we do that today. And also, we have the problem that the infringement was found based on the claims construction that's set. So if the court were inclined to change the claims construction from what the court below used, then we would ask that the infringement holding be set aside as well because it was decided based on this current claims construction. So I think that this idea that signaling requires a digital controller is not supported by the facts. It sounds like a matter of construction. And the court below basically said that, well, if you signal, causing the thing to shut on or shut off is the sensor signaling to the switch to fire. And so that's what we believe is the construction below. And we think it should not be disturbed. And that his argument that a digital controller is required has no merit. In the few minutes I have left, I would just like to make some observations about this case. Before you, please go ahead. Mr. Huntsman, could you talk a little bit about that one instruction from the judge to the jury as to the nature of the late testimony's discussion and reference to things that may or may not be obvious?  I know we're going to see the real thing next week, but I'd like to know what you recall. I think the record you have, I think we had the draft jury instructions, if I recall, are in the supplemental. Right, the draft jury instructions. My recollection is he followed pretty closely. I'm wondering about a specific verbal instruction given, you know, before the deposition tape started rolling on Mr. Peebs and his references to obviousness. If you recall, a few minutes ago. I do not recall. I mean, I do not recall as I stand here today. All right. But I would like to say that in patent law, I mean, there's two versions of obviousness. There's the 103 version of obviousness. In my own mind, I call that obviousness with a big O. And then there's obviousness in the lay sense. And the Supreme Court in KSR has explained that obvious to try is a factual method that one can use to try to invalidate a patent. So it's certainly within the scope of a rule 701 witness to testify at his opinion that it's obvious to do something. Because it's a matter of fact whether something is obviousness. It's not a matter of fact. It's a matter of law. Well, I'm saying obvious has two terms. It has a word that engineers use that know nothing about the law. Well, there are underlying facts. But it's a question of law. I think that that wasn't particularly changed. And I think that the Supreme Court in KSR didn't go so far as to say, don't bother me with the stature. No, I'm not saying that. I'm just saying they didn't go so far as to tell lay witnesses they can't use the word obvious because it's... They didn't say lay opinions. They were talking about common sense. We're talking about, in the face of that context, the common sense of the person of skill in the field of the invention. Whether someone walking in off the street and thinking, saying that it's obvious to me, it's not the same. Correct, it's not the same. But it's not improper for witnesses to so testify. Well, we'll see. Okay. The other thing is, if you look at the testimony of both witnesses, they were both asked by Mr. Sipple if they had an opinion on the invalidity of the patent. And both of them made it clear that they didn't know anything about patents and all that stuff. And that they were just testifying from their own experience. And that's in the record for both of those witnesses. And the jury heard that. Also, because the plaintiff challenged the judge's finding of obviousness, basically accused Judge Walker of rubber-stamping the jury verdict, Judge Walker did his own independent analysis and he laid it out in his opinion. And he was able to show that there was substantial evidence, just based on Mr. Fleshman's testimony. But that's a denial of J-Mall. I think you kind of conflate that in the brief with a bench trial where he made his own findings. There's a difference between denying J-Mall and making your own findings. True. But what he did show in that opinion was that there was substantial evidence based on witnesses other than Mr. Peebs. Yes. But if there's, first off, there's only four witnesses in the entire case. This is a streamlined patent case, which, by the way, I applaud you both for. But when there's only four witnesses and one of them who's a layperson, not an expert, gets on the stand and says over and over that he thinks it would have been obvious, that's really potentially prejudicial, very potentially prejudicial. And actually, I don't see that it has any relevance, given that he's not an expert. And so I'm not sure that the fact that there is substantial evidence for a finding in light of potentially high degree of prejudice is OK. I think a jury can make a distinction between a person saying, this was obvious for me to try versus saying, I think as a matter of law, these patents are invalid for obviousness. These experts were testifying from their own experience, and I don't think the jury had any difficulty figuring that out. A person is fully instructed on the law as well as of greatest concern in all obviousness cases is the effect of hindsight and as to how to put yourself in the mind when you didn't know what was going to work or not work, and as opposed to what looks like a simple change. And this, of course, is the problem with a lay witness, and where the jury, neither the witness nor the jury, is told the intricacies of patent law. We know it's not simple law. We know that it's very hard to somehow control the considerations so that it's predictable to some innovator who has an idea, wants to make a change, has an investment problem, and needs to think about, suppose it works. Does that mean that everyone's going to be able to copy it? So the friendly patent lawyer says, no, we'll patent it. And here we are. Here we are. Well, I see my time has gone. Can I ask one final question? Right before Judge Newman just spoke, you said, quote, these experts were testifying from their own experience. I met these witnesses. That's exactly the problem. I met these witnesses. See, that's exactly the problem. Experts could have offered this testimony, but you just referred to Mr. Peebs as an expert, and that's what he wasn't. I meant witnesses, but. Yeah. Got it. So it sounds like this case is going to turn on the instructions, which I am not helpful to enlighten the court on. So I have no further thoughts. Well, I will turn on trying to figure it out, trying to get it right. Thank you. Thank you. OK, you have your rebuttal time. All right. Very briefly, just because the court's curious about it, and we will have the actual instruction, but there is a summary. I'm struggling to get my papers together here. Oh, here it is. Page 101 and 102 of the appendix, Judge Walker summarizes what he was going to tell the jury. He says, I'm happy to give an instruction to the jury that it's their decision, and their decision only, to determine something as obvious. Obvious is a term of art, as they are going to apply it, and they need to apply the definition as this court instructs them, and they should not conflate what somebody else says as obvious to them with their ultimate task. I'm happy to give that qualification. But I don't think that just because somebody employs that word, it is a violation of the case law that you cited, or inconsistent with the 701 opinion. And we would differ with that. Even with the instruction that you'll see, under Rule 701, I believe the basic idea of Rule 701 is, if a lay opinion can be helpful to the jury, it could be admissible, the example being, how fast was that car going? And when you get to ultimate issues, like obviousness, or negligence, or things like that, then you're into the territory of prejudicial and confusing the jury. And I think that's the territory we veered into here. Very briefly on the other issues, the issue with respect to the YouTube video isn't whether it was authenticated. Nobody disputes it was authenticated. The question is whether someone skilled in the art would have been motivated to go look at it in 2012. And the only evidence that is pertinent to that, and Mr. Hussman alluded to it, is that Mr. Cornett did say, and I'll find the page number. Well, Mr. Cornett, I don't have the page number. I can't find it. Mr. Cornett did say he might have saw the videos, and I want to emphasize that that was plural. And the reason I emphasize that was plural is because Mr. Peebs actually posted several videos, only one of which is pertinent to this case, the other two of which were posted well after the priority date, 2013 and 2014.  that he saw the video in question is at best vague and equivocal, and that's the only... Yeah, but he doesn't have to see the video in question because the only issue you're arguing about is whether people would look at these types of videos at all. And his testimony is sufficient for that purpose, whether he saw this exact video. I think it's on the very, very borderline, Your Honor. That's a jury question, not a question of fact. Sufficient, that's the question. And then finally, on the... You had a question about why are we here. I want to make clear that as a result of this judgment, my client's patents have been invalidated. So it's not just Mr. Huntsman's client that's the problem here. There may be other people all over the world doing this, and my client now is in a position not to be able to stop it. Their patents have been invalidated. When does it expire? Say again? When does the patent expire? Oh, I don't know that. 20 years. It's 20 years from the first date. Yes. But that was quite a while ago, right? 2012. 2012 was the priority? Yes. So there's still a good 10 years to go here. So anyway, I just wanted to briefly address that. My time is up. We would request that you reverse the judgment and enter a judgment as a matter of law that the obvious offense was insufficient. Thank you. Okay. Thank you. Thank you both. The case is taken under submission. And that concludes our arguments for this morning.